IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> PLAINTIFF, <br><br> v. <br><br> $799,850.00 IN UNITED STATES CURRENCY SEIZED FROM EXTRA STORAGE SPACE, UNIT 4170, 1105 MOUNT VERNON HIGHWAY NE, ATLANTA, GEORGIA AND $14,335.00 IN UNITED STATES CURRENCY SEIZED FROM 6890 PEACHTREE DUNWOODY ROAD, UNIT 302, ATLANTA, GEORGIA, <br><br> DEFENDANTS. | Civil Action No. |

**VERIFIED COMPLAINT FOR FORFEITURE**

NOW COMES Plaintiff United States of America, by Richard S. Moultrie, Jr., Acting United States Attorney, and Nicholas L. Evert, Assistant United States Attorney, for the Northern District of Georgia, and shows the Court the following in support of its Verified Complaint for Forfeiture:

**NATURE OF THE ACTION**

1. This is a civil forfeiture action against $14,335.00 in United States Currency seized from 6890 Peachtree Dunwoody Road, Unit 302, Atlanta, Georgia and $799,850.00 in United States Currency seized from Extra Storage Space, Unit

1

4170, 1105 Mount Vernon Highway NE, Atlanta, Georgia (collectively the "Defendant Currency") as proceeds of sex trafficking by force, fraud, or coercion and/or coercion and enticement to engage in prostitution.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

3. This Court has in rem jurisdiction over the Defendant Currency pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because the acts or omissions giving rise to the forfeiture occurred in this district.

5. The Defendant Currency is presently being held in a secure account maintained by United States Immigration and Customs Enforcement ("ICE").

## BASIS FOR FORFEITURE
### Relevant Statutes

6. The Defendant Currency is subject to forfeiture pursuant to 18 U.S.C. § 1594(e)(1)(B) on the grounds that it constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1591.

7. The Defendant Currency is also subject to forfeiture pursuant to 18 U.S.C. § 2428(b)(1)(B) on the grounds that it constitutes or is derived from proceeds

traceable to a violation of 18 U.S.C. § 2422(a).

8. The Defendant Currency is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that it constitutes or was derived from proceeds traceable to a violation of a "specified unlawful activity."

9. 18 U.S.C. § 1956(c)(7) defines, in relevant part, a "specified unlawful activity" as any act or activity constituting an offense listed in 18 U.S.C. § 1961(1).

10. 18 U.S.C. § 1961(1) includes, as part of the list of offenses, acts indictable under 18 U.S.C. §§ 1581–1592.

11. 18 U.S.C. § 1961(1) also includes, as part of the list of offenses, acts indictable under 18 U.S.C. §§ 2421–2424.

## Factual Background

*Undercover Operation*

12. On or about March 23, 2024, as part of a sex trafficking investigation, a confidential information ("CI") working with the Roswell Police Department ("RPD") texted a phone number listed in an advertisement on an escort website to request an appointment for a friend.

13. The CI received a reply text that asked for the friend's location, and the CI said that the friend was in Roswell, Georgia.

14. The CI received the following reply text: "814 Roswell Creek Lane, Roswell, GA 30076. 160hhr, 200hr, 260VIP, 400 with 2 girls, cash only."

15. The CI then scheduled an appointment for March 26, 2024.

16. The reply text to the CI confirmed the appointment and provided a telephone number to call upon arrival on the date of the appointment.

17. On or about March 26, 2024, an undercover officer (the "UC") arrived at 814 Roswell Creek Lane, Roswell, Georgia, at the specified time and texted the telephone number that had been provided to the CI.

18. In response, the UC received a reply text that included the same pricing list that had been provided to the CI. The UC texted in reply that he wanted one hour, and in response, he received a map of the building and was instructed to go to Unit J.

19. The UC then exited his car and walked to Unit J. A woman opened the door and invited him into the apartment. Upon entering the apartment, the UC was escorted upstairs to a bedroom, which contained a queen size bed.

20. The woman then told the UC that it would cost $300.

21. The UC handed the woman $300 in U.S. currency.

22. The woman accepted the money.

23. The woman asked the UC to undress, and she briefly left the room.

24. When the woman returned, she straddled his back and began giving him a massage.

25. At that time, the UC heard noises from the room next door that

sounded like two people having sexual intercourse.

26. After a few minutes, the woman asked the UC to turn onto his back, and she removed her top and underwear, leaving her only wearing a black mini skirt.

27. The woman began straddling the UC's legs, and he asked her if she wanted to dance for him.

28. The woman began tickling the inside of the UC's legs, and he asked if she had any condoms.

29. She got off the bed and retrieved a condom from a pill bottle and a handful of wet wipes.

30. She began wiping down the UC's genital area.

31. The UC then gave a takedown signal, and RPD entered the apartment.

32. Law enforcement obtained a state search warrant to search the apartment.

33. Upon execution of the search warrant, officers found two bedrooms upstairs.

34. RPD discovered the UC, who was nude, and a woman later identified as "PX," wearing only a small black skirt in one bedroom.

35. RPD discovered a man named Martin Golden, who was nude, and a woman later identified as "ML," wearing only a bra, in the second bedroom.

36. Each room also contained a queen size bed, lingerie, and condoms.

37. Officers noted there were holes in the door frames outside the bedrooms that appeared to have been used to secure locks.

38. Building management later advised that they had inspected the apartment earlier and discovered used condoms in the bedrooms and locks on the outside of the doors. Building management had removed the locks because they violated fire codes.

39. Inside a hall closet, officers found more condoms and various sex-related paraphernalia, such as dildos, and restraints.

40. Law enforcement also discovered the $300 cash that the UC had provided to PX inside a hall closet.

*Interview of Victim ML*

41. During the execution of the search warrant, law enforcement interviewed ML.

42. ML relayed the following:

   a. ML had come to the United States from China two or three months earlier in order to repay debt she owed in China.

   b. Her passport had been taken from her, and she was in the process of paying her "boss" money she owed.

   c. ML had met her "boss" after responding to a post for employment as

6

a masseuse on WeChat group. The job required her to fly to Atlanta from New York.

d. ML arrived in Atlanta on or about February 29, 2024, and was met by an Asian male in his fifties who drove her to 814 Roswell Creek Lane.

e. Upon arriving at 814 Roswell Creek Lane, ML was told that she could not leave the apartment, or she would get into "trouble." She was also told that when clients arrived, she would need to wear makeup and lingerie and do whatever the client asked, including any requested sexual activity.

f. She remained at 814 Roswell Creek Lane for approximately 20 days before being moved in the middle of the night to another apartment about 30 minutes away.

g. At the new apartment, ML encountered PX.

h. ML stayed at the new apartment for a few days, but disliked it and bought a plane ticket back to New York; however, her boss told her that she could not leave and took her and PX back to 814 Roswell Creek Lane.

i. ML's boss was called "Sara."

j. "Sara" made all of the appointments for the women who worked for her, and they were not allowed to take any clients' numbers.

    k. "Sara" would inform the women when a client arrived, using a Ring camera by the door.

    l. "Sara" would pick up the money that the women had made every few days.

    m. ML was left only a small amount of money, which she used to pay for food that was delivered.

    n. "Sara" would take $30 daily for rent, and the rest of the money was taken to pay ML's debt.

    o. Before law enforcement arrived, ML had bought a ticket to leave Atlanta, and was planning to sneak out and try to run to the airport.

    p. When law enforcement arrived, ML was having sex with Golden.

    q. ML said that she believed that she and PX were being trafficked.

*Interview of Victim PX*

43. On or about March 27, 2024, law enforcement interviewed PX.

44. PX gave law enforcement the following information:

    a. PX came to the United States in September 2023.

    b. PX traveled to Atlanta from California on March 12, 2024 to pursue a job doing massage work that had been posted on WeChat.

    c. Upon arriving at the Atlanta Airport, PX was met by a Chinese male driving a black SUV. This ride had been arranged by the "boss."

    d. The "boss" was a Chinese woman who went by the name "Sara."

    e. PX identified "Sara" in a photograph of a woman named Qin Zhen.

    f. The driver took PX to an apartment that had two bedrooms and two women residing in it.

    g. Two days later, ML arrived, and PX and ML were transported to the apartment at 814 Roswell Creek Lane.

    h. Zhen coordinated all of the women's appointments.

    i. Zhen would let the women know when a client had arrived using a Ring camera mounted at the door.

    j. PX and ML were told that they needed to do whatever the "boss" wanted them to do, including sexual activities, or they would get "scolded."

    k. PX was made to provide sexual services to clients, including oral sex and sexual intercourse.

    l. PX asked to leave three or four times, but Zhen would not allow her to leave.

    m. Zhen generally came to the apartment every two days to collect the money that the women had made. Sometimes the driver who had picked PX up at the airport would come by and pick up the money.

45.     Law enforcement reviewed WeChat messages on PX's phone

between Zhen, PX, and what appeared to be other trafficked women.

46. Around the time of the execution of the search warrant at 814 Roswell Creek Lane, Zhen directed the other women to get rid of their phones.

47. There appeared to be 34 women (including Zhen) in this group chat.

*Jinpei Li*

48. Law enforcement identified Jinpei Li as the man who had picked PX up at the Atlanta Airport.

49. Li was arrested on August 22, 2024.

50. In interviews with Li, he admitted that he was responsible for picking up and dropping off women at the Atlanta airport on behalf of Zhen.

51. Li estimated that he had picked up between 50 and 70 women from the airport while working for Zhen.

52. Li also admitted that he sometimes collected cash from women on behalf of Zhen.

53. Li said that he had collected approximately $53,000 on behalf of Zhen. After collecting the money, he remitted it to Zhen in two ways: He paid approximately $13,000 to Zhen via Zelle, and he wrote a check for approximately $40,000 to pay the mortgage on Zhen's home.

*Arrests of Qin Zhen and Jeannot Joseph*

54. On or about August 22, 2024, Zhen and Jeannot Joseph were arrested

at their residence, 6890 Peachtree Dunwoody Road, Unit 302, Atlanta, Georgia, on trafficking a person for sexual servitude, trafficking a person for labor servitude, and RICO charges under Georgia law.

55. The arrests were part of an operation involving multiple law enforcement agencies, including RPD, Homeland Security Investigations, and the Dekalb County Police Department.

56. Zhen and Joseph are currently out on bond.

57. Law enforcement executed a state search warrant for 6890 Peachtree Dunwoody Road, Unit 302.

58. The search resulted in the seizure of numerous items including a money counter and $14,335.00 in United States currency.

*Surveillance of Yan Ding*

59. Around the same time law enforcement took Zhen into custody, RPD began surveilling her daughter, Yan Ding.

60. Ding was observed driving to the office of a law firm, briefly entering the office, and then returning to her vehicle. Before Ding got back into her vehicle, law enforcement saw what appeared to be a law firm employee walk outside and hand her a pair of bolt cutters.

61. Ding then drove to Extra Storage Space, located at 1105 Mount Vernon Hwy NE, Atlanta.

62. Law enforcement approached Ding, and she agreed to speak with them.

63. Ding stated that Unit 4170 was hers. She claimed that the unit contained furniture.

64. She stated that she lived with her mother, and her mother paid her bills.

65. When asked what her mother did for employment, she said she was unsure, but noted that she might have a cleaning business, although the two did not discuss the topic.

66. Law enforcement obtained a state warrant to search the storage unit.

67. In the unit, law enforcement found $799,850.00 in United States currency concealed inside a Gucci bag, which was concealed inside an air fryer box. The currency was wrapped in foil, a black material, and cellophane.

*Administrative Proceedings*

68. United States Customs and Border Patrol ("CBP") adopted the seizure of the Defendant Currency and initiated administrative forfeiture proceedings.

69. On November 14, 2024, CBP received a claim from Zhen through her attorney, Robert Wilson of the Arora Law Firm. Zhen asserted that she has an interest in $600,000 of the Defendant Currency, which she claims constitutes the

proceeds from the sale of her pervious home in China and loans obtained from her sister.

70. Zhen's address was listed as 6890 Peachtree Dunwoody Road, Apt. 302, Atlanta, Georgia 30323.

71. Wilson's address is listed on his firm website as 75 W. Wieuca Road NE, Atlanta, Georgia 30342.

72. After receiving this claim, pursuant to 18 U.S.C. § 983(a)(3), CBP referred the matter to the U.S. Attorney's Office for the Northern District of Georgia for judicial forfeiture.

**FIRST CLAIM FOR FORFEITURE**
**18 U.S.C. § 1594(e)(1)(B)**

73. The United States re-alleges and incorporates by reference Paragraphs 1 through 72 of this Verified Complaint for Forfeiture as if fully set forth herein.

74. Based on the foregoing, the Defendant Currency is subject to forfeiture to the United States pursuant to 18 U.S.C. § 1594(e)(1)(B) on the grounds that it constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1591.

**SECOND CLAIM FOR FORFEITURE**
**18 U.S.C. § 2428(b)(1)(B)**

75. The United States re-alleges and incorporates by reference Paragraphs 1 through 72 of this Verified Complaint for Forfeiture as if fully set forth herein.

76. The Defendant Currency is subject to forfeiture to the United States pursuant to 18 U.S.C. § 2428(b)(1)(B) on the grounds that it constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 2422(a).

### THIRD CLAIM FOR FORFEITURE
### 18 U.S.C. § 981(a)(1)(C)

77. The United States re-alleges and incorporates by reference Paragraphs 1 through 72 of this Verified Complaint for Forfeiture as if fully set forth herein.

78. The Defendant Currency is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), because it constitutes or was derived from proceeds traceable to a specified unlawful activity, namely sex trafficking by force, fraud, or coercion.

### FOURTH CLAIM FOR FORFEITURE
### 18 U.S.C. § 981(a)(1)(C)

79. The United States re-alleges and incorporates by reference Paragraphs 1 through 72 of this Verified Complaint for Forfeiture as if fully set forth herein.

80. The Defendant Currency is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), because it constitutes or was derived from proceeds traceable to a specified unlawful activity, namely coercion and enticement to engage in prostitution.

## PRAYER FOR RELIEF

WHEREFORE, the United States prays:

(1) that the Court forfeit the Defendant Currency to the United States of America;

(2) that the Court award Plaintiff the costs of this action; and

(3)     that Plaintiff have such other and further relief as the Court deems just and proper under the facts and circumstances of this case.

This 12th day of February, 2025.

                                            Respectfully submitted,

                                            RICHARD S. MOULTRIE, JR.
                                              *Acting United States Attorney*
                                              *600 U.S. Courthouse*
                                              *75 Ted Turner Drive SW*
                                              *Atlanta, GA 30303*
                                              *(404) 581-6000   fax (404) 581-6181*

/s/NICHOLAS L. EVERT
        *Assistant United States Attorney*
        Georgia Bar No. 693062
        nicholas.evert@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>PLAINTIFF,<br><br>v.<br><br>$799,850.00 IN UNITED STATES CURRENCY SEIZED FROM EXTRA STORAGE SPACE, UNIT 4170, 1105 MOUNT VERNON HIGHWAY NE, ATLANTA, GEORGIA AND $14,335.00 IN UNITED STATES CURRENCY SEIZED FROM 6890 PEACHTREE DUNWOODY ROAD, UNIT 302, ATLANTA, GEORGIA,<br><br>DEFENDANTS. | Civil Action No. |

**VERIFICATION OF COMPLAINT FOR FORFEITURE**

I, Tracy Le, have read the Complaint for Forfeiture in this action and state that its contents are true and correct to the best of my knowledge and belief based upon my personal knowledge of the case and upon information obtained from other law enforcement personnel.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This 12th day of February, 2025.

_____
TRACY LE
Special Agent
Homeland Security Investigations